UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


CIVIL ACTION NO. 13-12115-RGS

ARVID VON PAPEN
a/k/a/ EDDIE VON PAPEN

v.

JEFFREY W. RUBMAN and BRADD RUBMAN


MEMORANDUM AND ORDER ON
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

May 12, 2014

STEARNS, D.J.

In late November of 2010, Arvid Von Papen, a resident of Massachusetts, approached Vermont brothers Jeffrey Rubman and Bradd Rubman with the idea of selling them a campground on a lake in Wareham, Massachusetts. The campground was part of a 600-acre parcel (Property) that also contained cranberry bogs and a sand quarry. According to Von Papen, he shelved his original plan to buy the Property himself and instead assisted the Rubmans in making the purchase. In exchange, he alleges that Jeffrey Rubman promised him a 99-year lease on the bogs and the sand quarry. The Rubmans eventually took title to the Property, but never followed through with the promised lease. A problem: Jeffrey Rubman's alleged promise was never put in writing.

After a futile effort to obtain satisfaction from the Rubmans, Von Papen filed this lawsuit. As is often the case when a claim-at-law (in this case contract) appears shaky, Von Papen also seeks relief in equity. The Verified Complaint sets out eight counts – breach of contract (Count I); breach of the covenant of good faith and fair dealing (Count II); fraud in the inducement (Count III); promissory estoppel (Count IV); unjust enrichment (Count V); declaratory relief regarding the parties legal relationship (Count VI); and violation of Mass. Gen. Laws. ch. 93A (Count VII). Von Papen also seeks to reach and apply the Rubmans' right, title, and interest in Maple Park 200, LLC, the nominal owner of the Property (Count VIII). The Rubmans for their part move for summary judgment contending that no enforceable contract was ever agreed upon for the purchase or leaseback of the Property. Nor is there, they argue, any basis for an award of equitable relief.

## BACKGROUND

The facts in the light most favorable to Von Papen as the nonmoving party, as taken from the Rubmans' Statement of Material Facts (SOF), Von Papen's counterstatements, and the Verified Complaint, are as follows.[1]

---

[1] In his March 25, 2014 Response to the Rubmans' Statement of Undisputed Facts, Von Papen admits to fifty-one of the fifty-three paragraphs. *See* Pl.'s Response to Defs.' SOF - Dkt # 28.

In the summer of 2010, Von Papen learned that approximately 600 acres in Wareham, owned by Brock Tucy, was tied up in a Chapter 11 bankruptcy, and potentially for sale. The Property consisted of a lakeside campground (Maple Park), some underutilized cranberry bogs, and a sand quarry. Van Papen conceived the idea of purchasing the defaulted mortgage, buying the Property at a foreclosure sale, and then selling off or leasing Maple Park while keeping the bogs and sand quarry for himself. Von Papen persuaded two of his friends, William Deyesso and Robert Merowitz, to invest in the project.

In late November of 2010, a stockbroker told Deyesso that he had a client interested in purchasing a campground. The broker provided Von Papen with an introduction to Jeffrey Rubman. On December 4, 2010, Jeffrey Rubman signed a Confidentiality and Non-Disclosure Agreement (CNDA) with Von Papen and Deyesso. Jeffrey Rubman wrote an addendum to the CNDA that provided,

> [h]owever, in the event the discloser determines not to pursue a transaction, the limitations on the Recipient set forth in this Agreement shall terminate and be of no further force or effect. We will not proceed without your involvement for one year without your written release.

Compl. - Ex. A. That same day, Von Papen asked Jeffrey Rubman whether he and his brother Bradd Rubman might be interested in acquiring the entire Property and then leasing back to him the bogs and the sand quarry (about 440

3

acres of the whole). According to Von Papen, Jeffrey Rubman orally agreed to

the idea, provided that Von Papen over time make the Rubmans whole in lease

payments, which Von Papen agreed to do. Von Papen summarized his

understanding of the agreement with Jeffrey Rubman in an email to Deyesso

dated December 5, 2010.

> Spent the last 2 days working out a deal with the doctor [Jeffrey
> Rubman]. I hope you like were [sic] we are at this point. In
> general terms. He would buy the property (or note [sic] then the
> property). He would take what seems like approx 80 acres of the
> present campground area. With an additional approx 80 acres
> towards the river. We would lease the remainder approx 240 in
> that south parcel plus the approx 200 acre north parcel. He does
> not want an overlap of the two businesses. He's solely interested
> in the campground. We could have a 99 year lease. I told [him]
> we would need an option to buy. He agreed that we could exercise
> that option once we made him whole in lease payments. Possibly
> sooner based on our lease structure and performance. He has no
> interest in redevelopment. He should be open to a partial release
> scenario for form A's and subdivisions. The doctor is leaving for
> a week starting next weekend. We need to finish our proposal
> within the next few days in hopes of him going to the site at the
> mid to later part of this week. Please call me. Many decisions to
> be made. I brought us to the next step with him. He seems to be
> a very good human being. So rare these days.

Von Papen Aff. - Ex. A. Also on December 5, 2010, Von Papen provided Jeffrey

Rubman with aerial images of the Property and a description of its general

layout. On December 9, 2010, Bradd Rubman emailed Von Papen to say that

"Jeff and I are interested in pursuing the opportunity at Cape Cod." *Id*. - Ex. C.

He asked for additional information "prior to a site visit," including "who from

your group is involved," the present posture of "the bankruptcy/foreclosure" proceedings, "any permit violations," Von Papen's "definition of electrical problem(s)," whether the septic system had experienced "any recent failures," and for documents including income/expense statements, tax returns, a site map, and a campground brochure. *Id*. Bradd Rubman also asked, "How will the ongoing operations of the bogs and sand removal effect [sic] the campground atmosphere?" and for a "[t]imetable of this transaction." *Id*.

Von Papen responded to the questions in a December 13, 2010 email, adding that a memorandum of understanding (MOU) "would be greatly appreciated and could be drafted by your attorney prior to providing any financials. I believe that we are at the point whereby we should share a common understanding in writing of our proposal at this time." Defs.' Ex. 4 at 1. During the last week of 2010, the Rubmans broke off the discussions indicating that they were no longer interested in buying the Property.

In February of 2011, the Rubmans reinitiated contact with Von Papen expressing a renewed interest in the deal. As a followup, a letter from Von Papen's lawyer, dated March 1, 2011, proposed that the Von Papen "group" and the Rubmans form a "joint [v]enture" to acquire the mortgage to the Property, and then transfer the campground to the Rubmans and the remainder of the parcel to Von Papen. Defs.' Ex. 6. On March 2, 2011, Bradd Rubman

responded that he and his brother "have a high interest in the park, but are not interested in purchasing the note. Please let us know if/when you purchase the note." Defs.' Ex. 7.

Chris Zimmerman joined the Von Papen group in May of 2011. Zimmerman had obtained a June 27, 2011 appraisal of the Property valuing it at $11,455,000. Zimmerman spoke to Tucy (the nominal owner) and secured an option to purchase the Property, which was assigned to Maple Park Partners, LLC (a nominee trust organized by the Von Papen interests). On July 1, 2011, Von Papen emailed Jeffrey Rubman informing him that his group had "taken legal control of the property. We were successful with a workout with the owners and creditors. . . . The campground will continue to be operated with the current staffing guided and controlled by us. I hope that this new status might have some interest to you." Defs.' Ex. 9. Von Papen emailed the Rubmans on July 19, 2011, offering to facilitate a meeting between them and Tucy, and granting them "permission to continue your conversations and correspondences with Chris Zimmerman regarding the Wareham property." Defs.' Ex. 10. Von Papen requested a conference call that evening. In an email dated July 20, 2011, Bradd Rubman thanked Zimmerman and Von Papen for the prior evening's consultation. He also proposed to pay a visit on Friday (July 22, 2011), "to get a comprehensive tour of the property, an overview of

the community, get to know you two better and discuss details of the business transaction."  Defs.' Ex. 43.

On July 25, 2011, Bradd Rubman emailed Von Papen and Zimmerman with an offer to "purchas[e] the campground business and leasing the land for 100 years for $1m at closing, $225,000 per year for 20 years, and $50,000 per year from years 21 to 100."  Defs.' Ex. 11.  The Rubmans expected Von Papen's group "to be responsible for road repairs/maintenance, septic repair/maintenance, and water supply for the current 400+/- campsites."  *Id*. Bradd Rubman added a caveat, noting that the offer "has not been reviewed by legal counsel and a more formal offer will follow if we agree on basic terms." *Id*.  Von Papen emailed Zimmerman the same day expressing his disappointment that the cash terms of the Rubman's offer would not even cover maintenance and repairs, much less debt service on the Property, taxes, utilities and potential liabilities.  Defs.' Ex. 12.

On August 16, 2011, Bradd Rubman emailed Von Papen stating that he and his brother "are interested in the Wareham opportunity . . . .[however], we feel that it is best to hold off communicating with your group until #1 the roles of all individuals in your organization are fully defined and #2 you have a counter offer to present to us."   Von Papen Aff. - Ex. K.  After the Rubmans asked for permission to speak directly to Tucy, on August 24, 2011, Von Papen

provided them with Tucy's telephone number. On September 5, 2011, Von Papen asked the Rubmans for an update of their negotiations with Tucy. Jeffrey Rubman reported that he had revisited the Property and that if a deal could be struck, he would be back in contact with Von Papen.

Over the next several months the Rubmans and Von Papen discussed various purchase options, exploring different possible partners and financing alternatives.[2] On November 3, 2011, Von Papen emailed the Rubmans that, "after two stressful years working on this deal," this "may be the closest we have ever come." Defs.' Ex. 19. He informed the Rubmans that "in the last six months I have kept David Morgan and 2 other campground companies at bay."[3] *Id*. Also around this time, Von Papen provided the Rubmans with

---

[2] On October 31, 2011, Von Papen e-mailed the Rubmans and stated "[t]he most obvious points for now would be 1.) What would [Tucy] expect from our side? 2.) We would have to have some sort of lease number with an option to buy in the future , no later than 5 years. Do you want a proposal from us regard [sic] this? . . . I continue to feel a workable plan is possible." *See* Ex. 18. Bradd Rubman responded on November 1, 2011, "Please send us a proposal of how you would like this deal structured ." *Id*. Von Papen replied on November 1, 2011, that "[u]nder this scenario I would have to switch gears and partners. . . . It is highly possible that we can craft a proposal by the end of Wed for you. . . . There still remains the question as to what [Tucy]'s role would be. . . . It's difficult for me to structure a proposal with this open ended question, but I will try." *Id*.

[3] VonPapen claims that "[s]ometime between November 4, 2011, and November 8, 2011, I addressed extending the CNDA with Jeffrey. He told me, 'you don't need anything in writing. You have something better. You have my

"scientific data reflecting that the sand on the site had industrial use, which made the site much more valuable than previously thought." Compl. ¶ 26. Von Papen asked that, because the parties "are at this junction," they memorialize their agreement in an MOU "subject to change." Defs.' Ex. 19. Bradd Rubman responded that "[w]e are not currently in a position to enter into a memorandum of understanding with you." *Id*.

On November 10, 2011, the Rubmans, d/b/a 290 Glenn Charlie Road, LLC, signed a Purchase & Sale Agreement with Tucy. Between January 4, 2012, and February 15, 2012, Von Papen sent the Rubmans lot plans and soil images, answered questions from their appraiser, and provided information regarding survey and boundary issues. On February 15, 2012, Glenn Charlie Road, LLC, took title to the Property. Von Papen emailed the Rubmans, "Thank god the long bumpy road to the closing is over. Now Bradd can get back to his normal aging process." Suppl. Aff. of Bradd Rubman - Ex. 42.

On March 16, 2012, the Rubmans provided Von Papen with "a basic structure of a deal for the sand and agricultural uses at [the Property]," but cautioned him that the "document should in no way be construed as a formal

word.'" VonPapen Aff. ¶ 35. The Rubmans do not deny that Jeffrey Rubman made this statement, rather they claim that any discussion regarding an extension of the CNDA has no bearing on their motion for summary judgment. *See* Defs.' Response to Pl.'s SOF at #44.

offer or commitment, but rather as a beginning dialogue." Defs.' Ex. 21. Prior to discussing the deal with his other investors, Von Papen expressed concern to the Rubmans about the short (seven-year) term of the proposed lease. *Id.* at Ex. 23. Unwilling to budge on the lease term, the Rubmans proposed that Tucy "run the bogs." *Id.* at Ex. 27. Von Papen sent the Rubmans a written counter-proposal on April 3, 2012, and yet another on April 21, 2012. The Rubmans responded by email that, "as you work on your revision, please consider the following. . . . [W]e believe the best way to go forward is for [us] to continue to manage/maintain/upgrade the existing and future cranberry bogs and your group to extract the sand while building new bogs." *Id.* at Ex. 32. On April 24, 2012, Bradd Rubman sent a further email stating, "Perhaps Jeff & I (Maple Park Cranberries, LLC) are the cranberry company and we simply hire you (your company) to build the bogs." *Id.* at Ex. 33. On April 30, 2012, Von Papen expressed by email his "surprise and disappointment" that the Rubmans' proposed "terms and conditions are very different from what we had talked about through the process leading to your closing and very different from what [his] partners expected. You seemed to get all the benefit and we get all the risk with little potential for substantial reward." *Id.* at Ex. 36. He then outlined a counterproposal addressing each of the thirteen points set out in the Rubmans' original offer. After receiving no response, Von Papen

emailed the Rubmans on June 26, 2012, warning that "[b]ecause of the continual uncertainty of my position with the [P]roperty I'm reluctant at this juncture to continue to furnish any further assistance until my position is determined." *Id*. at Ex. 37. On June 27, 2012, Jeff Rubman responded, "I understand your position and appreciate the help you offered in the past. We await your proposal in reference to the sand removal but we will talk to other sand people as we continue to need to gather more knowledge of the type and value and the hurdles in optimizing both the cranberry bogs development and sand removal." *Id*. at Ex. 38. On August 18, 2012, the Rubmans sent a proposed "term sheet" for the Property to the Von Papen group. *Id*. at Ex. 39. On August 30, 2012, Von Papen's counsel responded with a Chapter 93A demand letter insisting on a 99-year lease with an option to purchase or, in the alternative, the payment of a lump sum settlement of $1,250,000. When the Rubmans failed to respond to the demand, Von Papen filed this lawsuit in Essex Superior Court. The Rubmans timely removed the case to the federal district court on diversity grounds on August 28, 2013. After discovery was completed, the Rubmans filed this motion for summary judgment. The court heard oral argument on the motion on May 2, 2014.

## DISCUSSION

Summary judgment is appropriate when "the movant shows that there

is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law based on the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits." *Thompson v. Coca-Cola Co.*, 522 F.3d 168, 175 (1st Cir. 2008), citing Fed. R. Civ. P. 56(c). "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party." *Id.*, quoting *Sánchez v. Alvarado*, 101 F.3d 223, 227 (1st Cir. 1996) (internal quotation marks omitted). "A fact is material if it has the potential of determining the outcome of the litigation." *Maymí v. P.R. Ports Auth.*, 515 F.3d 20, 25 (1st Cir. 2008). To defeat a motion for summary judgment, evidence offered by the non-movant "must be significantly probative of specific facts." *Pérez v. Volvo Car Corp.*, 247 F.3d 303, 317 (1st Cir. 2001), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Moreover, plaintiff's testimony has evidentiary force only to the extent that it is based on his personal knowledge of the subject about which he is testifying. Fed. R. Evid. 602; see also Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or

declarant is competent to testify on the matters stated."); *Vega v. Kodak Caribbean, Ltd*., 3 F.3d 476, 479 (1st Cir. 1993) ("[T]he material creating the factual dispute must herald the existence of 'definite, competent evidence' fortifying the plaintiff's version of the truth."). Notwithstanding, "when the facts support plausible but conflicting inferences on a pivotal issue in the case, the judge may not choose between those inferences at the summary judgment stage." *Coyne v. Taber Partners I,* 53 F.3d 454, 460 (1st Cir. 1995).

**Standing**

As a preliminary matter, the Rubmans contend that Von Papen lacks standing to maintain this lawsuit. They argue that, while Von Papen is pursuing claims against them in his individual capacity, the record shows that the disputed negotiations over the Property were not with Von Papen alone, but rather were with him and "an ever changing roster of partners." Defs.' Mem. at 12.[4]

The Rubmans' standing argument is based on the longstanding rule in Massachusetts that "all partners must be parties to a suit involving partnership rights." *Cacciola v. Nellhaus*, 49 Mass. App. Ct. 746, 754 (2000) (affirming the

---

[4] The Rubmans note that Von Papen referred to Deyesso and Merowitz as his "partners" in various of his emails, although Von Papen insists that he did so only in a colloquial sense and that the two men were simply his investors.

dismissal of an action where an individual plaintiff sought to enforce the rights of a partnership against the partnership's former attorney without joining the other partners as plaintiffs). Although a partnership may be formed under Massachusetts law without undue formality, for it to exist as a legal entity, certain elements must be present. These include: (1) an agreement manifesting an intent to associate in a partnership; (2) a sharing of profits and losses; and (3) participation by the parties in control and management of the partnersip business. *Fenton v. Bryan*, 33 Mass. App. Ct. 688, 690-691 (1992), citing the Uniform Partnership Act, Mass. Gen. Laws ch. 108A, § 7.

Because the Rubmans are the parties invoking federal jurisdiction (by way of removal), it is their burden to show that Von Papen lacks standing. *See Bennett v. Speas*, 520 U.S. 154, 167-168 (1997). This burden they have failed to carry, having offered no material evidence that Deyesso, Merowitz, and Von Papen (and/or Zimmerman) had formed an association that exhibited any of the minimal emblems of a legal partnership.

### Statute of Frauds

The Rubmans next argue that the Massachusetts Statute of Frauds bars Von Papen's claims involving the Property. The Verified Complaint seeks to enforce an oral agreement to enter into "a long term lease to operate cranberry bogs on the [Property]" and to "extract sand" from a quarry within its bounds.

Compl. ¶ 36. In Massachusetts, a party may not prosecute a claim for breach of contract concerning "any interest in or concerning [land] . . . unless the promise, contract or agreement upon which [an] action is brought . . . is in writing and signed by the party to be charged therewith." Mass. Gen. Laws ch. 259, § 1. The making of leases is "in or concerning" land. *See First Nat'l Bank of Boston v. Fairhaven Amusement Co.,* 347 Mass. 243, 245 (1964) ("The leasehold was an interest in land and subject to the statute of frauds."); *O'Brien v. Hurley,* 331 Mass. 172, 176 (1954) ("It is firmly established in this Commonwealth and recently confirmed that an oral agreement to create, renew, or extend a lease is not enforceable.").

In cases where the defendant pleads an affirmative Statute of Frauds defense (as have the Rubmans), "the burden [is] on the plaintiff either to prove a memorandum sufficient to satisfy the statute or to prove a contract to which the statute did not apply." *Beaver v. Raytheon Mfg. Co.,* 299 Mass. 218, 219 (1938). The form of the memorandum offered to satisfy the statute has no bearing so long as all essential terms are present together with the signature or mark of the party to be charged. *A.B.C. Auto Parts, Inc. v. Moran,* 359 Mass. 327, 329 (1971). *See* Uniform Electronic Transactions Act, Mass. Gen. Laws ch. 110, § 7 (electronic records and signatures satisfy the Statute). The writing need not consist of a single document – multiple documents, when

read together, may be sufficient to satisfy the Statute. *See Schmoll Fils & Co. v. Wheeler*, 242 Mass. 464, 469 (1922).

While the record in this case is replete with writings, none reflect progress among the aspiring deal-makers beyond "a state of imperfect negotiations" – much less reaching a meeting of the minds. *See Situation Mgmt. Sys., Inc. v. Malouf, Inc.*, 430 Mass. 875, 878 (2000) ("[T]o create an enforceable contract, there must be an agreement between the parties on the material terms of that contract, and the parties must have a present intention to be bound by that agreement . . . ."). To take an example, on November 3, 2011, Von Papen asked the Rubmans for a MOU ("I would like to have something tangible such as a memorandum of understanding in case something unforeseeable comes up. The terms of the MOU can be subject to change."). Defs. Ex. 19. However, the immediate response was that, "We [the Rubmans] are not currently in a position to enter into a memorandum of understanding with you." *Id*. Von Papen himself on numerous occasions recognized that an agreement had not been reached. For example, on April 3, 2012, he wrote to the Rubmans, "Here is a response to our ongoing process. . . . I feel because our interests are so tied together that we will come up with a workable plan." *Id*. - Ex. 29. And again on June 26, 2012, "Because of the continual uncertainty of my position with the [P]roperty I'm reluctant at this

16

juncture to continue to furnish any further assistance until my position is determined." *Id.* at Ex. 37.

Von Papen argues that the CDNA is a partially integrated agreement as evidenced by Jeffrey Rubman's penned addition to the document,[5] stating that, "We will not proceed without your involvement for one year without your written release." Compl. Ex. 1. Von Papen claims that in late 2010, Jeffrey Rubman told him not to worry about the one-year term of the CDNA. "If the thing is still going on, we will just extend the term." Von Papen Aff. ¶ 10. Von Papen also claims that sometime between November 4 and 8, 2011, when he again raised the issue, Jeffrey Rubman responded, "You don't need anything in writing. You have something better. You have my word." *Id.* ¶ 35.

Von Papen, citing *Hoffman v. Optima Sys., Inc.,* 683 F. Supp. 865 (1988), and *Celluci v. Sun Oil Co.,* 2 Mass. App. Ct. 722 (1974), argues that

---

[5] More generally, Von Papen argues that

the evidence could reasonably show that there was a partially integrated agreement by reason of Defendants' Exhibit 1 [the parties' Confidentiality and Non-Disclosure Agreement (CNDA)]. Moreover, the evidence could be reasonably establish an implied contract. A finder of fact could also infer from the defendants' conduct in most instances, and inaction in other circumstances, that they intended to maneuver the plaintiff out of the benefit of his labor.

Pl. Opp'n Mem. at 2.

these assurances by Jeffrey Rubman should estop the Rubmans from raising the Statute of Frauds as a defense to his contract claims, that is, "the estoppel doctrine either applies or may apply to enforce oral contracts in the context of the Statute of Frauds." Opp'n Mem. at 19. The argument might have some force if the dispute involved a violation by the Rubmans of the terms of the CNDA. However, the CNDA governed only the conditions under which a binding contract regarding the Property was to be negotiated. It did not contain, nor was it intended to memorialize, any binding terms of the sale or lease of the Property.

Here, because there is no writing or compilation of writings that demonstrates "[a]n enforceable agreement of (1) terms sufficiently complete and definite, and (2) a present intent of the parties at the time of formation to be bound by those terms," the Statute of Frauds is fatal to Von Papen's claim of breach of contract.[6] *Targus Grp. Int'l v. Sherman*, 76 Mass. App. Ct. 421, 428 (2010); *see also Held v. Zamparelli*, 13 Mass. App. Ct. 957, 962 (1982) ("Construction and enforcement of the agreement without these essential terms would be futile, and [the court] cannot supply these provisions without

---

[6] Whether a document contains the elements which make it an enforceable contract is a question of law, rather than fact. *Schwanbeck v. Fed.-Mogul Corp.*, 412 Mass. 703, 709 (1992).

writing a contract for the parties which they themselves did not make.").[7] As there is no evidence to support a binding agreement between the Rubmans and Von Papen – much less a "writing signed by the parties to be charged" as is necessary to satisfy the Statute of Frauds – Von Papen's claims for breach of contract (Count I), and breach of the covenant of good faith and fair dealing (Count II)[8] must be dismissed as a matter of law.[9]

**Fraud in the inducement (Count III)**

Von Papen claims that "Jeffrey and Bradd secured services and

---

[7] The present dispute illustrates the policy underlying the Statute of Frauds – to prevent misunderstandings based on unrealized expectations or surmise. *See Cantell v. Hill Holliday Connors Cosmopulos, Inc.*, 55 Mass. App. Ct. 550, 553 (2002); *Brighton Packing Co. v. Butchers' Slaughtering & Melting Ass'n*, 211 Mass 398, 405 (1912).

[8] Without a valid, enforceable contract, there can be no implied covenant of good faith and fair dealing. *See Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.,* 412 F.3d 215, 230 (1st Cir. 2005) ("[T]he implied covenant of good faith and fair dealing governs conduct of parties after they have entered into a contract; without a contract, there is no covenant to be breached."); *see also Chokel v. Genzyme Corp.*, 449 Mass. 272, 275-276 (2007) ("The scope of the covenant is only as broad as the contract that governs [it].")*; Levenson v. L.M.I. Realty Corp.*, 31 Mass. App. Ct. 127, 131 (1991) (same).

[9] Count VIII, which asserts unjust enrichment, must also be dismissed. A person who has been unjustly enriched at the expense of another must make restitution. *Fox v. F & J Gattozzi Corp.*, 41 Mass. App. Ct. 581, 589 (1996). However, unjust enrichment is a theory of equitable recovery, and not a freestanding cause of action. *Lopes v. Commonwealth*, 442 Mass. 170, 179 (2004). Because the Rubmans are not wrongfully in possession of a thing rightfully belonging to Von Papen (that is, a leasehold in the Property), there is no basis under which they could be ordered to disgorge it.

information from the plaintiff in order to acquire the Site," Compl. ¶ 44, "by promising [him] compensation in the form of a long term lease containing an option to buy regarding the operation of cranberry bogs on the Site and the extraction of sand from the Site . . . never intending to [do so]." *Id.* ¶¶ 45-47. To state a claim for fraud in Massachusetts, a plaintiff must allege that "(1) the defendant made a false representation of material fact, (2) with knowledge of its falsity, (3) for the purpose of inducing the plaintiff to act in reliance thereon, (4) the plaintiff relied upon the representation, and (5) the plaintiff acted to his detriment." *Armstrong v. Rohm and Haas Co., Inc.*, 349 F. Supp. 2d 71, 81 (D. Mass. 2004); *see also Bishay v. Foreign Motors, Inc.*, 416 Mass. 1, 12 (1993). Because Von Papen is unable to adduce evidence of a binding promise to grant him a long-term lease in the Property, see the discussions of the Statute of Frauds, *supra*, and Promissory Estoppel, *infra*, the essential first element of the claim (a false statement of material fact) is lacking.

### Promissory estoppel (Count IV)

Von Papen claims that the Rubmans

> are estopped to deny the existence of a contract . . . [as] [i]n reliance on Jeffrey and Bradd's promise to enter into a long term lease to operate the cranberry bogs on the site and extract minerals from the site, [VonPapen] provided valuable information to Jeffrey and Bradd, did leg work, and consulted with others on their behalf. [Von Papen] put the interest of working with Jeffrey and Bradd ahead of other interests.

Compl. ¶¶ 51-52. "Circumstances that may give rise to an estoppel are (1) a representation intended to induce reliance on the part of a person to whom the representation is made; (2) an act or omission by that person in reasonable reliance on the representation; and (3) detriment as a consequence of the act or omission." *Bongaards v. Millen*, 440 Mass. 10, 15 (2003). There is an important qualification to the rule: statements of a promissory nature (and predictions regarding future events) are not "false when made," unless it can be shown that the maker never intended to carry out the promise (that is, misrepresented his intent at the time the promise was made), or knew that the predictions were false or that the promise was impossible to perform. *Cohen v. State Street Bank and Trust Co.*, 72 Mass. App. Ct. 627, 631 (2008) (investment advisor's prediction that "long term results should be fine"); *see also Commonwealth v. True*, 16 Mass. App. Ct. 709, 712 (1983) ("[M]ore than mere failure to perform a promise is required to support an inference of deceptive intent."); *Commonwealth v. McCauliff*, 461 Mass. 635, 642-643 (2012) (same); *Palmacci v. Umpierrez*, 121 F.3d 781, 787 (1st Cir. 1997), quoting 4 Collier on Bankruptcy ¶ 523.08[1][d], at 523-43 ("[T]his is true 'even if there is no excuse for the subsequent breach.'").

Here, while the record shows that the Rubmans gave Von Papen assurances of their interest in eventually reaching an agreement over a

leasehold in the Property, and expressed their hopes for a successful negotiation, the only statements of a promissory nature that might be construed by the finder of fact as a misrepresentation of present intent were those of Jeffrey Rubman involving the term of the CNDA.[10]  The CNDA, however, as previously observed, has no bearing on the existence of a contract (inchoate or not) to convey a leasehold in the Property.  Thus, this claim fails as well.

### Declaratory relief as to the parties' legal relationship (Count VI)

To obtain declaratory relief, a plaintiff must show: (1) an actual controversy; (2) standing; (3) the joinder of necessary parties; and (4) the exhaustion of all available administrative remedies.  *Sch. Comm. of Hudson v. Bd. of Educ.*, 448 Mass. 565, 579 (2007).  An actual controversy exists where there is "a 'real dispute' caused by the assertion by one party of a duty, right, or other legal relation in which he has a 'definite interest,' in circumstances indicating that failure to resolve the conflict will almost inevitably lead to litigation."  *Dist. Attorney for the Suffolk Dist. v. Watson*, 381 Mass. 648, 659

---

[10] It will be recalled that on March 16, 2012, the Rubmans presented Von Papen with "a basic structure of a deal for the sand and agricultural uses at [the Property]," but that the discussions broke down over the duration of the proposed lease.  Defs.' Ex. 21.

(1980), quoting *Bunker Hill Distrib., Inc. v. District Attorney for Suffolk County*, 376 Mass. 142, 144 (1978). While the declaratory judgment statute (Mass. Gen. Laws ch. 231A) is to be liberally construed, "[a] judge enjoys some discretion in deciding whether a case is appropriate for declaratory relief." *Pazolt v. Dir. of the Div. of Marine Fisheries,* 417 Mass. 565, 569 (1994).

Von Papen claims that a controversy exists regarding the "right, duty, status or other legal relationship between [him] and Jeffrey and Bradd [Rubman]." Compl. ¶ 61. Von Papen asks the court for a declaration that he is entitled "to compensation for the services he provide[d] to Jeffrey and Bradd, or entities they own or control, in the form of a long term lease to exploit the cranberry bogs and sand on the [Property]." *Id.* ¶ 59. Von Papen's expectation of a lease comes from the assistance he rendered to the Rubmans in their acquisition of the Property and his not unreasonable belief that he is entitled to a reward for his efforts. However, as the parties never entered into a legally binding relationship, there is none for the court to adjudge and declare. And absent such a relationship, the court is without power to award one party property that legally belongs to another.

### Violation of Mass. Gen. Laws. ch. 93A (Count VII)

Under the test of *Atkinson v. Rosenthal*, 33 Mass. App. Ct. 219 (1992), Chapter 93A is implicated only by those breach of contract cases that smack of

an "extortionate quality." *Framingham Auto Sales, Inc. v. Workers' Credit Union,* 41 Mass. App. Ct. 416, 418 (1996). "It is not . . . immoral, unethical, oppressive, or unscrupulous – and therefore not unfair or deceptive – to break off incomplete and imperfect negotiations of a commercial agreement. Every deal that goes sour does not give rise to a [Chapter] 93A claim." *Pappas Indus. Parks, Inc. v. Psarros*, 24 Mass. App. Ct. 596, 600 (1987). That is the case here.

ORDER

For the foregoing reasons, defendants' motion for summary judgment is <u>ALLOWED</u>. The Clerk will enter judgment for the Rubmans and close the case.

SO ORDERED.

/s/ Richard G. Stearns

_____

UNITED STATES DISTRICT JUDGE